

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 17, 2016

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

     Re:    *United States* v. *Jonathan Rodriguez, et al.*, S2 15 Cr. 445 (PAE)

Dear Judge Engelmayer:

    The Government respectfully submits this letter in opposition to the appeal of JONA-THAN HARRIS, a/k/a "Eggy" (the "defendant") from the determination of the Honorable Ronald L. Ellis ordering the defendant to be detained pending trial in this case.[1]  For the reasons set forth herein, the Government respectfully submits that this Court should order the defendant's continued detention pending trial.

## BACKGROUND

    Since in or about 2006, the New York City Housing Authority's Patterson Houses (the "Patterson Houses") in the NYPD's 40th Precinct in the South Bronx, New York have been at the center of a violent feud between a street gang known as "18 Park," which operated primarily in the Patterson Houses, and its rival gangs.  During the mid-2000s, 18 Park was loosely affiliated with another gang that also operated in the South Bronx known as the "Young Gunnaz," or the "YGz."  Over time, however, that affiliation deteriorated, and a violent rivalry between 18 Park and the YGz developed.  This rivalry resulted in dozens of shootings—some of which resulted in innocent bystanders being shot—and several murders.  With each violent incident and murder, the animosity between 18 Park and its rivals grew, leading to increasing levels of violence between the gangs.

    For example, on July 6, 2010, an 18 Park associate named Mavon Chapman, a/k/a "E-Saw," a/k/a "Max-E," was shot and killed, which 18 Park members believed to have been carried

---

[1] The Government expects to receive the pretrial services report and transcript from the bail argument before Judge Ellis on Monday, June 20, 2016, and will submit both the report and transcript under separate cover.

out by YGz members and associates.  At Chapman's funeral ceremony, 18 Park members re-
solved to retaliate against YGz members and associates, and agreed that no 18 Park members
could be affiliated with the YGz going forward.  By way of example, some YGz members have
distinguishing "YGz" tattoos signifying their affiliation with the YGz gang.  At and after Chap-
man's funeral, HARRIS and other 18 Park members agreed thatany 18 Park member who had a
YGz tattoo must cover up the tattoo with another one; in at least one instance, HARRIS person-
ally instructed an 18 Park member to cover up that member's YGz tattoo, which the 18 Park
member did.

Although 18 Park and its members and associates had engaged in shootings and other vi-
olent acts before Chapman's murder, the group's violent activities escalated after his murder.
The violence between 18 Park and its rival gangs, including the YGz, ultimately led to a shooting
that occurred on or about May 29, 2011, in which Johnny Moore, a 16-year-old associate of
Square Gang who lived in the Patterson Houses, was shot and killed by members of 18 Park
Gang.[2]  The violence escalated further from there.  Since the murder of Johnny Moore, 18 Park
Gang members have committed numerous shootings, including several attempted murders, in the
course of 18 Park Gang's feud with its rival gangs.

In addition to committing violent acts together, members and associates of 18 Park enrich
themselves by selling drugs.  In particular, members and associates of 18 Park distributed sub-
stantial quantities of cocaine base in a form commonly known as "crack," heroin, cocaine, mari-
juana, and other drugs.  18 Park members and associates initially distributed these drugs within
its territory in the Patterson Houses and elsewhere in the Bronx.  As the gang's narcotics activi-
ties grew and became more sophisticated, 18 Park's drug trafficking organization expanded to
other locations, where the drugs could be sold for higher prices.  One of those other locations
was Massena, New York, where members and associates of 18 Park—including HARRIS—
transported and distributed large quantities of drugs.

Against this background, the Office of the United States Attorney for the Southern Dis-
trict of New York, together with the Bureau of Alcohol Tobacco and Firearms ("ATF"), the
Drug Enforcement Administration ("DEA"), and the New York City Police Department
("NYPD") have conducted a federal investigation into the racketeering activities of 18 Park and
its members and associates.  As part of that investigation, among other things, law enforcement
officers have (i) performed physical surveillance; (ii) performed undercover drug buys; (iii) in-
terviewed witnesses, including confidential sources and cooperating witnesses who are expected
to testify at trial; (iv) intercepted telephonic communications pursuant to judicially authorized
orders of interception; (v) executed search warrants on, among other things, physical locations,
cellular telephones, and social media accounts; and (vi) seized narcotics, firearms, and other con-
traband.

On December 9, 2015, a Grand Jury in this District returned Indictment S2 15 Cr. 445
(PAE), charging HARRIS and twenty-five other defendants in a six-count indictment alleging a

---

[2] On or about May 26, 2016, defendant WALI BURGOS pleaded guilty before Your Honor to
the murder of Johhny Moore and a separate attempted murder.  *See* S2 15 Cr. 445 (May 26, 2016
Minute Entry).

racketeering conspiracy in connection with the enterprise known as 18 Park, violent acts in aid of racketeering, a narcotics conspiracy, and related firearms offenses.

HARRIS is currently charged with participating in the racketeering conspiracy, participating in the narcotics conspiracy, and a related firearms offense.  The racketeering conspiracy charge carries a maximum term of imprisonment of life; the narcotics conspiracy charge carries a maximum term of imprisonment of life and a mandatory minimum term of imprisonment of ten years; and the firearms charge carries a maximum term of imprisonment of life and a mandatory minimum term of imprisonment of ten years, to run consecutively to any other term of imprisonment.

On December 11, 2015, HARRIS voluntarily surrendered to law enforcement in connection with the charges in this case.  He was presented and arraigned that same day before the Honorable Ronald L. Ellis.  After a detention argument, Judge Ellis ordered HARRIS to be detained pending trial.  HARRIS has now appealed Judge Ellis' decision ordering him to be detained pending trial.

## DISCUSSION

### A.  Applicable Law

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."  18 U.S.C. § 3142(e).  Because the Indictment charges HARRIS with committing crimes of violence and narcotics offenses, detention pending trial is governed by 18 U.S.C. § 3142(e)(3). That statute imposes a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community."  The defendant bears the burden of producing evidence to rebut that presumption. *United States* v. *Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). This presumption requires the defendant to produce evidence that he does not pose a danger to the community or a risk of flight.  "Satisfying the burden of production does not," however, "eliminate the presumption favoring detention; it 'remains a factor to be considered among those weighed by the district court.'" *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States* v. *Mercedes,* 254 F.3d 433, 436 (2d Cir.2001)).

In assessing the danger to the community presented by a defendant's release, courts shall "take into account the available information concerning" several factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance [or] firearm . . ."; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

## B. Argument

The Government respectfully submits that each of the relevant factors weighs in favor of continued detention in this case.

### 1. The Nature and Circumstances of the Charged Offenses Weigh in Favor of Detention

To begin with, the nature and circumstances of the offenses charged weigh in favor of detention. As explained above, Count One of the Indictment charges the defendant with participating in a racketeering conspiracy that is responsible for, as predicate acts, at least one murder, several attempted murders, and a number of other violent acts, some of which the defendant personally participated in. In fact, the Indictment lists as an overt act a shooting in which HARRIS personally fired gunshots at two associates of a rival gang. *See* Second Superseding Indictment ¶ 7n. Count One therefore constitutes a "crime of violence" under § 3142(g). *See United States* v. *Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002).

Count Five of the Indictment charges HARRIS with participating in a narcotics conspiracy, which is responsible for a large quantity of various types of narcotics, including for 280 grams and more of crack cocaine. As the Second Circuit has explained, "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'" within the context of § 3142. *United States* v. *Leon*, 766 F.2d 77, 81 (2d Cir. 1985). That is particularly true here, where 18 Park's narcotics trafficking was not simply a way to make money, but it was the lifeblood and daily activity of a gang that controlled and reinforced its drug territory through violence and threats of violence—of precisely the sort the defendant participated. By converting its "territory" within the Patterson Houses—which encompasses a playground, basketball courts, and numerous densely populated residential buildings—into an open-air drug market, and by storing guns in and around that territory to protect that drug business, the defendant and other 18 Park members endangered the lives of the innocent people living in the area.

Count Six of the Indictment charges HARRIS with possessing a firearm in connection with the racketeering conspiracy, which firearm was discharged. This count plainly "involves . . . a firearm" and constitutes a "crime of violence" under § 3142(g), further supporting detention. *See, e.g.*, *English*, 629 F.3d at 322 (upholding district court's denial of bail for defendant charged with violations of 21 U.S.C. § 846 and 18 U.S.C. § 924(c)). The Government expects, moreover, that the evidence presented at trial will establish not just that the defendant possessed firearms, but that on multiple occasions the defendant personally fired guns at other individuals in and around the Patterson Houses. This charged conduct obviously presents a grave danger to the community, thus further supporting detention here.

### 2. The Weight of the Evidence Against the Defendant Strongly Favors Detention

In addition, the weight of the evidence against the defendant also supports detention. The Government expects the evidence at trial to show, among other things, the following: Numerous cooperating witnesses are expected to testify that HARRIS is a core member of 18 Park, and

several of those cooperating witnesses are expected to testify that he is a leader of the gang; this testimony will be corroborated by numerous other types of evidence, including social media evidence, surveillance, undercover drug buys, and intercepted wiretap communications.

Cooperating witness testimony also will establish that, after the murder of Mavon Chapman on July 6, 2010, which is described above, HARRIS was part of the effort to break 18 Park away from the YGz gang, which HARRIS and other 18 Park members suspected to have been responsible for the murder.  In particular, cooperating witness testimony will establish that HARRIS directed an 18 Park member, who had previously been affiliated with the YGz and had a YGz tattoo, to cover up the YGz tattoo with another tattoo, which the 18 Park member did. Furthermore, at a funeral ceremony for Chapman, HARRIS advocated for other 18 Park members to take action against the YGz and other gangs affiliated with the YGz, including by stating, in substance and in part, that 18 Park members must shoot at YGz members in retaliation for the Chapman murder.

The Government expects the evidence further to show that, as HARRIS grew older and committed violent acts on behalf of 18 Park, his stature within 18 Park grew, and, by the time of his arrest, HARRIS was one of the leading members of 18 Park.  In this vein, the Government expects to establish that HARRIS was integrally and directly involved in the violent and narcotics activity of the gang.

*HARRIS' participation in violent acts in connection with 18 Park.*  The Government expects cooperating witness testimony and other evidence to establish, among other things, that HARRIS participated in or personally committed the following violent acts:

1.  In August or September 2014, HARRIS fired multiple gunshots at two members of a rival gang who had encroached into 18 Park's territory in the vicinity of 331 East 146th Street in the Bronx, New York.

2.  In another incident, HARRIS dressed up as a woman, donning a wig and pushing a stroller, to disguise himself as he entered the territory of a rival gang carrying a firearm.  Once in the rival gang's territory, HARRIS fired multiple shots at rival gang members.

3.  During a fight between 18 Park and a rival gang that occurred in 18 Park's territory, HARRIS left the fight, returned with a firearm intending to shoot at the rival gang members, but the fight was broken up before HARRIS could shoot.  After the incident, HARRIS stored the firearm in the apartment where another 18 Park member resided within the Patterson Houses.

4.  During another fight between 18 Park and a rival gang, HARRIS assaulted a leader of the rival gang with a cane.

5.  HARRIS routinely held and stored firearms for 18 Park at different stash houses and other locations.  For example, cooperating witness testimony and other evidence will establish that HARRIS routinely visited and possessed firearms at a stash house located in the vicinity of East 146th Street and College Avenue in the vicinity of the Patterson Houses in the Bronx.  Cooperating witness testimony and other evidence will also establish that, when 18 Park members

left the stash house, they typically would carry a firearm outside with them.  While outside, rather than carry the firearm on their person, 18 Park members would typically store the firearm in a hidden location that was easily accessible in the event a member or associate needed the firearm in connection with the gang's activities.  One such location was inside a light pole at the intersection of East 146th Street and College Avenue.  (The light pole had a metal cover that was broken, and thus that permitted 18 Park members to open the cover and hide firearms inside the light pole.)  On multiple occasions, HARRIS personally hid, and later retrieved, a firearm from the light pole.

*HARRIS' participation in 18 Park's drug trafficking organization.*  The Government also expects the evidence to establish that HARRIS was integrally involved in 18 Park's drug trafficking organization, and was in fact a leader of the narcotics activity.  Among other things, the Government expects the evidence to show, among other things, that:

1.  HARRIS was one of the leaders of 18 Park's expansion of its drug distribution network from the Bronx to upstate New York, including Massena, New York, where 18 Park's drugs could be sold for higher prices.  Among other things:

a.  On or about September 9, 2015, HARRIS was arrested in connection with the search of a residence in Saint Lawrence County, near Massena, New York.  HARRIS was present in the residence during the search and was found hiding in a bedroom after law enforcement officers entered.   During the search, law enforcement officers found, among other things (i) approximately 110 grams of cocaine; (ii) approximately $11,351 in United States Currency; (iii) quantities of marijuana; (iv) one gram of heroin; (v) scales; (vi) narcotics packaging materials.  HARRIS was ultimately charged in Norfolk Town Court with Criminal Possession of a Controlled Substance in violation of New York Penal Law 220.16(12), a Class B Felony.  Those charges are still pending.

b.  HARRIS communicated directly with other leaders of the gang's narcotics organization, including with JONATHAN RODRIGUEZ, a/k/a "Bebo," and MARQUIS WRIGHT, a/k/a "Mark," and was personally involved in transporting narcotics from the Bronx to Massena for resale.  For example, on or about June 11, 2015, in telephone conversations intercepted pursuant to a judicially authorized wiretap on a cellphone used by RODRIGUEZ, RODRIGUEZ and WRIGHT had a conversation about HARRIS' efforts to transport narcotics from the Bronx to Massena.  Starting at approximately 8:44 p.m., the following intercepted conversation took place, in substance and in part:

WRIGHT:  Yo?
RODRIGUEZ:  Yo, what's good buddy?
WRIGHT:  [unintelligible].
RODRIGUEZ:  Hey yo, you still got home?
WRIGHT:  Yeah.
RODRIGUEZ:  Alright but cuz I might have, I might have, I might have um, cuz Eggy comin down I might set somethin up with nigga for me.
WRIGHT:  Alright, I'm uh leave it . . . I'm uh leave with my bro [unintelligible].
RODRIGUEZ:  Alright bro.  Who gonna have it, Christian?

> WRIGHT:  Nah I'm goin leave it at the crib, Mike goin get the key so he'll have, if you need it from the crib.
> RODRIGUEZ:  Alright, but you know exactly what's there?
> WRIGHT:  Yeah.
> RODRIGUEZ:  Alright. What nigga?
> WRIGHT:  Yeah. I'm comin over tonight.
> RODRIGUEZ:  What, what's there exactly though?
> WRIGHT:  Like 65.
> RODRIGUEZ:  Alright [unintelligible] say no more.

The Government expects to show, at trial, that during this conversation, RODRIGUEZ asked WRIGHT if WRIGHT has any heroin ("home") and WRIGHT responded that he has approximately 65 grams ("[l]ike 65").  RODRIGUEZ also told WRIGHT that HARRIS (a/k/a "Eggy") was returning from Massena to the Bronx ("Eggy comin down") and that RODRIGUEZ would have HARRIS pick up drugs from WRIGHT to take back to Massena for resale ("I might set something up with nigga for me.").

Later that same night, at approximately 10:31 p.m., RODRIGUEZ and WRIGHT had another conversation, intercepted pursuant to the same judicially authorized order of interception, during which, in substance and in part, WRIGHT told RODRIGUEZ that "it is by the stove in the drawer," and that there "is 35 A-Rod and 65 home ready."  RODRIGUEZ states that "Eggy is coming to get the A-Rod" and that RODRIGUEZ "is going to take the home and is going up too."

The Government expects to show that during this conversation, WRIGHT informed RODRIGUEZ that he had 35 grams of cocaine ("A-Rod") and 65 grams of heroin ("home") in a drawer near his stove.  RODRIGUEZ then told WRIGHT that HARRIS ("Eggy") would pick up the cocaine ("A-Rod"), and that RODRIGUEZ would pick up the heroin ("home") and ensure the heroin was transported to Massena, because RODRIGUEZ was planning to go to Massena as well (RODRIGUEZ "is going up too.").

That same night, during approximately the same time period, toll records reveal that HARRIS communicated with WRIGHT a number of times in and around the time WRIGHT and RODRIGUEZ agreed that HARRIS would pick up the drugs from WRIGHT.[3]  For example, on June 11, 2015:  (i) 9:50 p.m. (40 seconds); (ii) 10:41 p.m. (40 seconds); (iii) 11:00 p.m. (42 seconds); (iv) 11:01 p.m. (2 seconds); (v) 11:01 p.m. (9 seconds); (vi) 11:01 p.m. (39 seconds); and (vii) 11:02 p.m. (14 seconds).  On June 12, 2015: (i) 1:28 a.m. (25 seconds); (ii) 1:50 a.m. (54 seconds); (iii) 11:03 a.m. (25 seconds); (iv) 11:05 a.m. (25 seconds); (v) 3:20 p.m. (56 seconds); (vi) 7:12 p.m. (1 minute 7 seconds); (vii) 7:57 p.m. (1 minute 34 seconds); (vii) 8:01 p.m. (1 minute 19 seconds); (ix) 8:03 p.m. (4 minutes 52 seconds); (x) 8:36 p.m. (1 minute 35 seconds); (xi) 9:04 p.m. (1 minute 2 seconds); and (xii) 10:02 p.m. (52 seconds).  The Government expects

---

[3] During this time period, the Government had obtained an order of interception for a cellular phone used by RODRIGUEZ, but not WRIGHT.  The Government did not obtain an order of interception for WRIGHT until on or about August 19, 2015. Thus the contents of the conversations between WRIGHT and HARRIS described in this paragraph were not intercepted.

to show that these conversations between HARRIS and WRIGHT involved the planning and execution for HARRIS to pick up the narcotics WRIGHT and RODRIGUEZ had discussed in the intercepted conversations described above.

2.   In addition, the Government also expects to prove through a variety of different types of evidence—including cooperating witness testimony, seizures of narcotics, and undercover drug buys, among others—that HARRIS was integrally involved in 18 Park's Bronx-based narcotics activity.  To take one example, on December 12, 2013, law enforcement officers executed a search warrant at a stash house used by 18 Park located in the vicinity of East 146th Street and College Avenue.  During the execution of that search warrant, law enforcement officers recovered, among other things:  (i) approximately 130 grams of crack-cocaine; (ii) approximately 35 grams of cocaine; (iii) approximately 20 grams of heroin; (iv) approximately 20 grams of marijuana; (v) 19 live 9mm rounds of ammunition; (vi) 8 live rounds of .45 caliber ammunitions; (vii) one Ruger magazine.  At the time the search warrant was executed, HARRIS was not present, but eleven of his co-defendants in this case were present.  Witness testimony and other evidence will establish that HARRIS regularly frequented that stash house, and possessed drugs and guns in the stash house, and sold drugs from the stash house.  The Government also expects to present evidence of other seizures of narcotics, executed in connection with wiretap surveillance of cellular telephones used by 18 Park members, from members or associates of 18 Park as those members or associates were transporting the drugs from the Bronx to Massena.

### 3.   The History and Characteristics of the Defendant and the Nature and Seriousness of the Danger He Would Post if Released Also Weigh Heavily in Favor of Detention

Finally, the history and characteristics of the defendant and the nature and seriousness of the danger he would pose if released also weigh heavily in favor of detention here.  In his submission, the defendant relies heavily on his youth as a factor that, he contends, weighs in favor of bail.  Although it is true that the defendant is relatively young, his criminal and violent conduct—which includes shootings and other acts of violence—is serious, and has already presented grave dangers to the public.  Those dangers, as demonstrated by the summary above of some of the evidence the Government expects to introduce at trial, are serious and warrant continued detention here.

In addition to the evidence of the charged crimes, some of which is outlined above, the Government also expects to introduce evidence at trial regarding specific threats HARRIS made against another 18 Park member whom HARRIS believed was cooperating against a different 18 Park member in a prior state-court prosecution.  Specifically, the Government expects to present evidence at trial that, in a previous state-court case, an 18 Park member made a statement to law enforcement officers implicating another 18 Park member in a crime.  When that statement was produced to the other 18 Park member in discovery in the state case, HARRIS obtained a copy of the statement and circulated it among other 18 Park members.  HARRIS also threatened the 18 Park member who had made the statement, in an effort to dissuade that member for further cooperation with law enforcement.  Thus, even if some combination of conditions could conceivably protect the community from HARRIS' violent acts—and for the reasons explained above, the Government submits that there are no such conditions—those conditions could not ensure that

HARRIS would not repeat his troubling pattern of threatening and intimidating witnesses, in-cluding cooperating witnesses, and otherwise seeking to obstruct justice in this case.[4]

## CONCLUSION

For all these reasons, the Government respectfully submits that continued detention is warranted here.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:            /s/

James McDonald
Samson Enzer
Andrew Adams
Dina McLeod
Assistant United States Attorneys
Tel. (212) 637-2405

---

[4] Although the Government's primary basis for seeking continued detention is dangerousness, the Government also believes the defendant poses a flight risk, given the seriousness of the charges against him, the substantial mandatory minimum sentences he faces, and the strength of the Government's case.  It is true, as the defendant notes, that the defendant self-surrendered to law enforcement on December 11, 2015, but the defendant at that time would not have been forced to come to grips with the strength of the Government's case against him, or the substantial sentence he faces if convicted.  The Government accordingly believes that risk of flight provides an additional reason why continued detention is warranted here.