UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                             :

UNITED STATES OF AMERICA,      :
                             :

         - v. -             :              15 Cr. 445 (PAE)
                             :

JONATHAN RODRIGUEZ, *et al.*,      :
                             :
                             :

              Defendants.      :

------------------------------------------------------ x


## THE GOVERNMENT'S MOTION *IN LIMINE*


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

James McDonald
Max Nicholas
Assistant United States Attorneys
      - *Of Counsel* -

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................. 1

Background ................................................................................................................... 2

I.      Background and History of 18 Park ............................................................... 2

II.     18 Park's Drug Distribution Activity ............................................................. 6

III.    18 Park's Violent Activity .............................................................................. 7

Argument ................................................................................................................... 10

I.      The Court Should Admit Various Co-Conspirator Statements Made During the
        Course of, and in Furtherance of, the Charged Racketeering Conspiracy ....... 10

        A.      Applicable Law ................................................................................. 11

        B.      Discussion ......................................................................................... 14

                1.      Statements made by 18 Park members or associates immediately before
                        or during an incident. .............................................................. 14

                2.      Statements made by 18 Park members or associates during the course of
                        the conspiracy but after the act in question occurred ..................... 16

                3.      Statements made by 18 Park members or associates directing other
                        members or associates to commit acts as part of the racketeering
                        conspiracy. ............................................................................. 19

                4.      Statements made by 18 Park members or associates about the status of
                        other members or associates of 18 Park ....................................... 20

                5.      Statements made by 18 Park members or associates during the course of
                        the conspiracy while incarcerated on the charges in this case. .......... 20

                6.      Statements made by 18 Park members or associates about the history and
                        practices of 18 Park and its leadership structure ............................ 23

                7.      Statements made by 18 Park members or associates in rap videos uploaded
                        to YouTube ............................................................................. 24

II.     The Court Should Admit Testimony About a Bystander's Reaction to a Shooting as
        an Excited Utterance or Present Sense Impression .......................................... 34

i

    A.    Applicable Law ......................................................................................................... 35

          1.    Excited utteranced admissible under Rule 803(2). ........................................ 35

          2.    Present sense impressions admissible under RUle 803(1) ............................ 36

    B.    Discussion .............................................................................................................. 37

Conclusion ................................................................................................................................ 39

## PRELIMINARY STATEMENT

By Order dated July 14, 2016, this Court separated into three groups the defendants charged in indictment S4 15 Cr. 445 (PAE) with racketeering and other offenses in connection with a violent street gang known as "18 Park." (Dkt. No. 276.) The Court and parties have referred to these three groups as Group 1, Group 2, and Group 3. The first trial date, for the Group 1 defendants, is scheduled for October 31, 2016, with jury selection set to begin October 24, 2016.[1]

In advance of the October 31, 2016 Group 1 trial, the Government respectfully submits this motion *in limine*, raising the following issues. *First*, the Government moves to admit, through the testimony of various cooperating witnesses, certain statements from other members of 18 Park as co-conspirator statements made in furtherance of the conspiracy, which are admissible under Federal Rule of Evidence 801(d)(2)(E). In this motion, the Government has separated the various co-conspirator statements into categories, and has provided illustrative examples of each. Those categories include: (a) statements made by members or associates of 18 Park in the lead up to acts committed as part of the racketeering conspiracy, or while those acts were being committed; (b) statements made by members or associates of 18 Park about acts committed as part of the racketeering conspiracy, where the statements were made during the racketeering conspiracy, but after the acts in question had occurred; (c) statements made by one 18 Park member or associate directing another (or multiple) 18 Park members or associates to commit acts as part of the racketeering conspiracy; (d) statements made by members or

---

[1] The Government's best present expectation is that the October 31, 2016 trial is likely to include all, or some combination, of the following defendants: COREY HEYWARD, RAHEEM AMARIZAN, a/k/a "Rah Rah," KAYE ROSADO, a/k/a "Trippa," and MIGUEL ROMERO, a/k/a "Mikey." HEYWARD, RAHEEM AMARIZAN, and ROSADO are charged in Count One (racketeering conspiracy); Count Ten (narcotics conspiracy); and Count Thirteen (firearms offense). ROMERO is charged in Count One and Count Thirteen.

associates of 18 Park about the status of other members of the racketeering conspiracy; (e) certain statements made by members or associates of 18 Park while incarcerated on the charges in this case; (f) statements made by members or associates of 18 Park about the history and practices of 18 Park and its leadership structure; and (g) certain statements made by members of 18 Park in rap videos uploaded to YouTube.

*Second*, the Government moves to admit, through a cooperating witness, testimony about a bystander's reaction to a shooting, which the bystander witnessed, where the bystander's statements were made seconds after the shooting. The Government expects the cooperating witness to testify that the cooperating witness observed MIGUEL ROMERO conduct the shooting, and the Government also intends to elicit testimony from the cooperating witness that, seconds after the shooting, a bystander stated, in substance and in part, "that was that Spanish guy Mikey from 18." The Government moves to admit the bystander's out-of-court statement as an excited utterance under Federal Rule of Evidence 803(2) and, alternatively, as a present sense impression under Federal Rule of Evidence 803(1).

## BACKGROUND

### I.      Background and History of 18 Park

Beginning in approximately 2006 and continuing through the operative indictment in this case, a number of individuals, primarily young men, formed a violent street gang that was based in the New York City Housing Authority's Patterson Houses in the South Bronx (the "Patterson Houses"). The gang operated primarily under the name "18 Park," but it also used the names "18 Park – Young Money," or "Young Money," and was alternatively referred to by the shorthand of "18" or "YM." This motion refers to the gang as the 18 Park Gang, or 18 Park.

18 Park is highly territorial, and considers its territory to be the northern portion of the Patterson Houses—from approximately East 145th Street and College Avenue to approximately

East 148th and College Avenue, running east to Third Avenue. Members and associates of 18 Park made money by selling illegal drugs within this territory, and they protected their turf by committing violent acts—including assaults, shootings, attempted murder, and murder—against rival gang members and other individuals who stood in their way.

18 Park members identify themselves with distinctive hand signs and a distinctive handshake. The gang had slogans its members used in conversation with one another, on social media, or in rap videos; one such slogan was "if you ain't young money you ain't seein' money." And several members of 18 Park have tattoos with the letters "YM," signifying "Young Money," an alternative name for 18 Park.

Until approximately 2009, 18 Park and another gang that operated in the Bronx, known as the "Young Gunnaz," or the "YGz," were largely affiliated, and individuals were permitted to be members of both gangs at the same time. Beginning in approximately 2009, however, the affiliation between the 18 Park and the YGz started to deteriorate, and members of the two gangs began to commit violent acts against one another. The budding rivalry between the two gangs came to a head on July 6, 2010, when 18 Park member Mavon Chapman, a/k/a "E-Saw," a/k/a "Max-E," was murdered just a few blocks from the Patterson Houses, in the vicinity of East 149th Street and Morris Avenue. Members of the 18 Park Gang believed members of the YGz Gang were responsible for Chapman's murder, and the 18 Park members agreed to separate themselves from the YGz Gang, and to retaliate against the YGz. One way YGz members showed their gang membership was through a tattoo with the letters "YG." One way 18 Park members disassociated themselves from the YGz following Chapman's murder was to require any 18 Park members who had a "YG" tattoo to cover up the "YG" tattoo with another tattoo, sometimes with a "YM" tattoo or with a dollar sign tattoo.

After 18 Park split from the YGz, the YGz became one of 18 Park's primary rivals. 18 Park members thereafter sometimes referred to 18 Park as "YGk," which meant "Young Gunnaz Killaz." Another primary rival of 18 Park was a gang known as "Square Gang." Whereas 18 Park operated primarily in the northern part of the Patterson Houses, Square Gang operated primarily in the southern portion—*i.e.*, to the south of East 143rd Street. Until approximately May 2015, YGz and Square Gang were largely affiliated with one another, and sometimes fought together against 18 Park.[2] Many of the violent acts carried out by 18 Park members targeted members of the YGz or Square Gang.

At approximately the same time 18 Park separated itself from the YGz Gang, 18 Park began to hold meetings to discuss gang activity, organize the gang's affairs, and to coordinate the gang's violent acts and drug distribution network. 18 Park also held cookouts and other events in an effort to recruit new members. The 18 Park Gang initially held these meetings and cookouts in the Patterson Houses area, but the members became concerned that the gatherings would make them a target for violent acts committed by rival gangs in the area, so the leaders of 18 Park moved the meetings to other locations, including an area in the vicinity of Macombs Road in the Bronx. During the gang's meetings, 18 Park members often would pass around a shoebox for members to make monetary contributions, which would go towards the purchase of firearms. Any member who did not contribute would be put on a form of probation within the gang, typically for period of two weeks, and would not be permitted to participate in gang activity until the member contributed to the fund.

---

[2] The split in May 2015 between the YGz and Square Gang arose from the murder of a YGz associate on or about May 30, 2015, in the vicinity of 350 East 143rd Street, near the Patterson Houses, which YGz members believed to have been committed by Square Gang members.

At approximately the same time 18 Park split from the YGz, 18 Park developed distinct tiers of membership. Membership initially was broken down into "King Mulas," who were at the top of the gang, "Top Mulas," who were in the middle, and "Baby Mulas," who had recently become members of the gang. Leaders of the gang maintained a list of the gang members in each category, and members of the gang could move up through the gang's ranks by, among other things, earning money for the gang, committing violent acts for the gang, or recruiting new members.

The violence between 18 Park and its rivals escalated further following the May 29, 2011 murder of Johnny Moore, who was 16-years old. As alleged in this case, on May 29, 2011, several 18 Park members, including WALI BURGOS, MARQUIS WRIGHT, and KEITH RUIZ, traveled to rival gang territory so that BURGOS could shoot YGz members in retaliation for a previous assault. BURGOS shot into a crowd of individuals he believed to be YGz members, and ultimately hit Johnny Moore, killing him. The YGz and Square Gang members committed violent acts against 18 Park members in retaliation for the murder of Johnny Moore, and 18 Park members responded with their own violent acts. The violence between the groups escalated from there.[3]

Over time, 18 Park was able to expand its territory beyond the Patterson Houses. For example, the gang expanded into an area in the Bronx northwest of the Patterson Houses, in the vicinity of Macombs Road. The gang members who operated primarily in the Macombs area referred to themselves as "Young Money – Miami Ave.," with "Miami" standing alternatively for "Money Is A Major Issue," or "Macombs Is A Major Issue." The 18 Park members referred

---

[3] On May 26, 2016, WALI BURGOS pleaded guilty to, among other things, the murder of Johnny Moore in connection with the racketeering enterprise 18 Park. *See* 15 Cr. 445 (S.D.N.Y. May 26, 2016) (Minute Entry). MARQUIS WRIGHT and KEITH RUIZ, who have both been charged with the murder, are scheduled for trial with the Group 3 defendants, in June 2017.

to the Patterson Houses area as "Mula Ave.," with "Mula" serving as slang for money. Beginning in approximately 2015, members of 18 Park expanded their drug dealing territory to include the vicinity of Massena, New York; members and associates of 18 Park would transport illegal drugs from the New York City area to the vicinity of Massena, where the drugs could be sold at a higher price.

## II.     18 Park's Drug Distribution Activity

18 Park members made money together by, among other things, selling illegal drugs within the gang's territories. As part of the gang's drug business, the gang used various locations—or "stash houses"—where the gang would store drugs, guns and ammunition, and money. Typically, only members or associates of 18 Park would be permitted to enter these stash locations, and these stash locations served as centers for the gang's operations. 18 Park members also enlisted associates, who themselves were not formally members of 18 Park, to assist them in carrying out their drug business. These associates of 18 Park were permitted to sell drugs within 18 Park's territory, to obtain drugs through 18 Park's supply network, and to use the gang's stash locations.

One of the gang's stash locations was 485 Courtlandt Avenue, Apartment 1B, Bronx, New York—an apartment in which defendant MIA DENTICO resided (the "DENTICO Stash Apartment"). On or about December 12, 2013, law enforcement officers executed a judicially-authorized search warrant at the DENTICO Stash Apartment and recovered large quantities of crack cocaine, heroin, cocaine, marijuana, over $3,000 in cash, and two types of ammunition—including one magazine containing eight .45 caliber live rounds, and nineteen .9mm live rounds. Present during the execution of the search warrant were 18 Park members and associates JONATHAN RODRIGUEZ, a/k/a "Bebo," MARQUIS WRIGHT, a/k/a "Mark," JASON

BENJAMIN, a/k/a "JC," WILLIAM AMARIZAN, a/k/a "Will Dolalrs," a/k/a "Spanish Will," RAHEEM AMARIZAN, a/k/a "Rah Rah," COREY HEYWARD, DAQUAN MCBETH, a/k/a "Day Day," KAYE ROSADO, a/k/a "Trippa," ANDREW ECHEVARRIA, a/k/a "Drew," KENNETH JENKINS, and MIA DENTICO, each of whom was arrested on state charges related to the search and seizure. ROSADO ultimately pleaded guilty in Bronx Supreme Court to narcotics-related offenses in connection with the incident. After ROSADO pleaded guilty, the charges against the other 18 Park members or associates arrested during the search were dropped.

### III.    18 Park's Violent Activity

18 Park members also committed violent acts to advance the goals of the gang and protect its territory. These violent acts often occurred in and around the Patterson Houses, and were committed by 18 Park members to harm, intimidate, or kill members of rival gangs, to protect or expand 18 Park's territory, or to retaliate against rival gang members for prior violent acts committed against members of 18 Park. Sometimes the violent acts committed by the 18 Park members hit their intended targets, leaving members of rival gangs stabbed, slashed, or shot. Other times the 18 Park members missed their intended targets, but left stray bullets in the doors, windows, and apartments within Patterson Houses. Still other times, 18 Park members missed their marks, but the stray bullets hit innocent Patterson House residents, leaving them with bullet wounds requiring medical attention. In all events, the violent acts committed by 18 Park members wreaked havoc on the Patterson Houses and its residents, and reinforced the gang's dominance over its territory.

Specifically as to the Group 1 defendants, among the violent acts the Government expects to prove at trial are:

1.      On or about August 16, 2009, members of 18 Park and the YGz were engaged in a fight in the vicinity of 308 East 145th Street in the Patterson Houses.  During the fight, COREY HEYWARD retrieved a firearm and fired a number of shots at what he believed to be a group of YGz members.  HEYWARD's shots ultimately missed their intended target and hit a fellow 18 Park member.  Other shots fired by HEYWARD hit the window of one of the Patterson Houses apartment units.

2.      On or about August 31, 2010, members of Square Gang, the rival gang that operated primarily on the southern side of the Patterson Houses, walked along Third Avenue near the intersection of East 146th Street—in what 18 Park considered to be its territory. RAHEEM AMARIZAN fired a number of shots at the Square Gang members, one of which hit a Square Gang member ("Square Gang Member-1") in the leg.

3.      In early 2011, COREY HEYWARD instructed a fellow 18 Park member, who is now a cooperating witness ("CW-1"), to hold two firearms ("Firearm-1" and "Firearm-2," respectively) in a certain apartment in the Patterson Houses so that the firearms would be available for use by 18 Park members as needed.  CW-1 did as told.  On or about July 7, 2011, after WILLIAM AMARIZAN assaulted a member of Square Gang ("Square Gang Member-2"), WILLIAM AMARIZAN met with fellow 18 Park members to plan a shooting of Square Gang Member-2.  To this end, during the late evening on or about July 7 and the early morning on or about July 8, 2011, WILLIAM AMARIZAN met with RAHEEM AMARIZAN, a co-conspirator and fellow 18 Park member ("CC-1"), and CW-1 to plan the shooting.  The group agreed, in substance and in part, that: (a) WILLIAM AMARIZAN would approach the group of rival gang members and chase them toward a location where CC-1 and RAHEEM AMARIZAN would be waiting; (b) CC-1, using Firearm-1, would shoot at the rival gang members, while RAHEEM

AMARIZAN would serve as the lookout; and (c) CW-1 would hold the door to a nearby Patterson Houses building so WILLIAM AMARIZAN, RAHEEM AMARIZAN, and CC-1 could quickly escape after the shooting.  To effectuate this plan, during the early morning hours on or about July 8, 2011, CW-1 provided CC-1 with Firearm-1, and the group of 18 Park members proceeded as planned.  Square Gang Member-2, it turned out, was carrying a firearm as well, and a shootout ensued.  As a result of the shootout, RAHEEM AMARIZAN was shot in the stomach, and taken to a nearby hospital for treatment.

4.  On July 20, 2012, COREY HEYWARD, along with JONATHAN RODRIGUEZ, WILLIAM AMARIZAN, and JONATHAN HARRIS, assaulted a member of a Square Gang ("Square Gang Member-3") because they saw Square Gang Member-3 getting a haircut at a barbershop that 18 Park considered to be within its territory.  To protect its turf, the group of 18 Park members assaulted Square Gang Member-3, punching, stomping, and stabbing Square Gang Member-3, leaving lacerations to Square Gang Member-3's chest, back, and arms, and stab wounds that hit the stomach, liver, diaphragm, and abdomen.  Square Gang Member-3 was taken to the hospital, arriving in critical condition before being treated and making a recovery.

5.  On September 15, 2012, COREY HEYWARD possessed a firearm and used it to fire several gunshots in the vicinity of 308 East 145th Street—near where he had shot his fellow 18 Park member approximately three years before.

6.  During the summer of 2013, MIGUEL ROMERO, a/k/a "Mikey," possessed a firearm and used it to fire a number of gunshots at a group of Square Gang members, including Square Gang Member-2, near the basketball courts in the vicinity of 300 East 143rd Street in the Patterson Houses.  ROMERO did not hit the Square Gang members, but he later made statements about the incident, in a recorded rap video that was uploaded to YouTube.  In the rap

video, ROMERO states that he "ma[d]e that nigga salsa, when I be on my blammin' shit," which ROMERO later explained to CW-1 referred to the fact that ROMERO's gunshots had made Square Gang Member-2 dance ("salsa") to avoid being hit by the bullets ("on my blammin' shit').

## ARGUMENT

**I.      The Court Should Admit Various Co-Conspirator Statements Made During the Course of, and in Furtherance of, the Charged Racketeering Conspiracy**

The Government expects that various cooperating witnesses will testify about statements made to them by members of the racketeering conspiracy while the cooperating witnesses themselves were members of the conspiracy.  In particular, the Government expects to elicit testimony falling into the following categories, which the Government submits are co-conspirator statements admissible under Rule 801(d)(2)(E):  (a) statements made by members or associates of 18 Park in the lead up to acts committed as part of the racketeering conspiracy, or while those acts were being committed; (b) statements made by members or associates of 18 Park about acts committed as part of the racketeering conspiracy, where the statements were made during the racketeering conspiracy, but after the acts in question had occurred; (c) statements made by one 18 Park member or associate directing another (or multiple) 18 Park members or associates to commit acts as part of the racketeering conspiracy; (d) statements made by members or associates of 18 Park about the status of other members of the racketeering conspiracy; (e) certain statements made by members or associates of 18 Park while incarcerated on the charges in this case; and (f) statements made by members of 18 Park about the history and practices of 18 park and its leadership structure.  For each of these categories of co-conspirator statements, the Government has provided examples below, which are intended to be illustrative, not exhaustive.

In addition, the Government expects to offer at trial excerpts of three rap videos, which were uploaded to YouTube (where they remain publicly available), in which MIGUEL ROMERO and other members of 18 Park make statements relating to, and in furtherance of the racketeering enterprise. And the Government expects to elicit testimony from cooperating witnesses about these rap videos.

### A.    Applicable Law

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." *United States* v. *Ulbricht*, 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing *United States* v. *DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993)); *see also United States* v. *Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment"), *cert. denied sub. nom. Ramirez-Talavera* v. *United States*, 501 U.S. 1211 (1991).

When determining whether the predicate conspiracy has been established, the district court is not bound by the rules of evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States* v. *Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily* v. *United States*, 483 U.S. 171, 181 (1987)).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *Untied States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States* v. *Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States* v. *Thai*, 29 F.3d at 813; *see also Dresna*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted). For example, in *United States* v. *Lozano-Reyes*, the Second Circuit affirmed the trial court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits." *United States* v. *Lozano-Reyes*, No. 95-1707, 1996 U.S. App. LEXIS 14182, at *5 (2d Cir. June 12, 1996). Or, as another example, in *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991), the Second Circuit affirmed the district court's admission of co-conspirator statements, through the testimony of a cooperating witness, about a murder that had already taken place. The district court there permitted a cooperating witness to testify that four separate members of the enterprise acknowledged their participation in a murder of a debtor to the organization. *Id.* The court of appeals explained that Rule 801(d)(2)(E) permitted the cooperating witness testimony about these conversations because "discussions of [the] murder and, the reasons for it, may well have served to promote the criminal activities of the [enterprise] by enforcing discipline among its members." *Id.* "Because these statements may have promoted cohesiveness among the Crew and helped induce Crew member assistance in the affairs of the criminal enterprise, the district court did not abuse its discretion in admitting the disputed testimony." *Id.* (emphasis added); *see also United States* v. *Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1987) (finding co-conspirator statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators); *United States* v. *Ruggiero*, 726 F.2d 913, 923-24 (2d Cir. 1984)

(statements made by co-conspirator Ruggiero reporting defendant Santora's role in a homicide were admissible against Santora).

**B.     Discussion**

The Government respectfully submits that the following categories of co-conspirator statements are admissible against all defendants under Rule 801(d)(2)(E).  Illustrative examples of each category of co-conspirator statement are provided in the discussion below.

### 1.     Statements made by 18 Park members or associates immediately before or during an incident

At trial, the Government intends to introduce, through cooperating witnesses who were members or associates of 18 Park at the time, certain statements made by other members or associates of 18 Park during the immediate lead up to acts taken on behalf of 18 Park, or while those acts were being committed.  These statements were, among other things, "designed to promote or facilitate achievement of the goals of the conspiracy" and thus should be admitted under Rule 801(d)(2)(E).  *See Rivera*, 22 F.4d at 436.

For example, the Government expects CW-1 to testify about conversations between CW-1, WILLIAM AMARIZAN, RAHEEM AMARIZAN, and CC-1 leading up to the shootout with Square Gang Member-2 and other Square Gang members on or about July 8, 2011.  The Government expects CW-1 to testify, in substance and in part, that on or about July 7, 2011, WILLIAM AMARIZAN told CW-1 that WILLIAM AMARIZAN had just assaulted Square Gang Member-2, and, during the course of the assault, had stolen a baseball cap from Square Gang Member-2, which WILLIAM AMARIZAN gave to CW-1.  WILLIAM AMARIZAN, RAHEEM AMARIZAN, CW-1, and CC-1 then discussed their plans to shoot Square Gang Member-2 and other rival gang members later that night.  Among other things, WILLIAM AMARIZAN, RAHEEM AMERIZAN, CW-1, and CC-1 agreed that: (a) CW-1 would provide

CC-1 with Firearm-1, which COREY HEYWARD had previously provided CW-1; (b) WIL-
LIAM AMARIZAN would chase Square Gang Member-2 and any other Square Gang members
in the direction of CC-1; (c) RAHEEM AMARIZAN would serve as the lookout for CC-1; and
(d) CW-1 would hold open the door to a nearby Patterson Houses building so the group could
escape quickly after the shooting. Each of the statements made by these 18 Park members in
preparation for, and leading up to, this incident is a statement in furtherance of the conspiracy,
and thus should be admitted through the testimony of CW-1. Specifically, each of the state-
ments were intended to, and did, "prompt the listener . . . to respond in a way that promotes or
facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958, "seek to
induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotation marks
omitted), and "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d
52, 87 (2d Cir. 1999).

For similar reasons, certain statements made by members and associates of 18 Park in
connection with their arrests and prosecutions in connection with the search of the DENTICO
Stash Apartment on or about December 12, 2013 are admissible as co-conspirator statements.
For example, the Government expects a cooperating witness, who was an associate of 18 Park at
the time ("CW-2"), to testify, in substance and in part, that after the arrests following the search
and seizure at the DENTICO Stash Apartment, several of those individuals discussed the arrests
and charges, as well as 18 Park's activities at the DENTICO Stash Apartment. These conversa-
tions and statements were made in the context of efforts by MARQUIS WRIGHT and others to
arrange for one of the arrestees with relatively less criminal history to plead guilty to the
contraband seized from the DENTICO Stash Apartment, in the hopes that the individual
accepting responsibility would receive no term of imprisonment, and would spare the other 18

Park members and associates who had been arrested. CW-2 was a party to those conversations, which sought to "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera* 022 F.2d at 958, and "to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotation marks omitted). Ultimately, KAYE ROSADO pleaded guilty to charges related to the seizure of contraband from the DENTICO Stash Apartment, and charges against the remaining 18 Park members and associates were dropped.

In a similar vein, the Government intends to introduce, through the testimony of cooperating witnesses, statements made by KAYE ROSADO that, in substance and in part, indicated that he pleaded guilty to the narcotics charges arising from the search and seizure from the DENTICO Stash House in order to spare the other 18 Park members time in jail. ROSADO's statements similarly are co-conspirator statements admissible under Rule 801(d)(2)(E).

## 2. Statements made by 18 Park members or associates during the course of the conspiracy but after the act in question occurred

Statements about events that took place after crimes were committed, when made by one 18 Park member or associate to another during the course of the racketeering conspiracy, are also admissible as co-conspirator statements. These statements are designed to "apprise a co-conspirator of the progress of the conspiracy," *Rahme*, 813 F.2d at 36; *see also Desena*, 260 F.3d at 158; *see also United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (explaining that "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current development and problems facing the group" (internal quotations omitted)).

For example, in connection with its proof of the stabbing and attempted murder of Square Gang Member-3 on or about July 20, 2012, the Government expects a cooperating witness, who

was a member of 18 Park at the time ("CW-3"), to testify that JONATHAN HARRIS discussed the incident with CW-3 in the hours following the incident. Among other things, the Government expects CW-3 to testify that HARRIS told CW-3, in substance and in part, that HARRIS and other 18 Park members, including COREY HEYWARD, were walking in the vicinity of East 146th Street and Third Avenue, in an area 18 Park members considered to be 18 Park's territory, when HARRIS saw Square Gang Member-3 getting a haircut at a barbershop in the vicinity of East 146th Street and Third Avenue. HARRIS told CW-3 that: (a) HARRIS stated to the other 18 Park members that Square Gang Member-3 should not be permitted to get a haircut in 18 Park's territory; (b) HARRIS and the other 18 Park members, including HEYWARD, went into the barbershop and assaulted Square Gang Member-3; (c) HEYWARD and WILLIAM AMARIZAN punched Square Gang Member-3, who fell to the ground, and then began to stomp Square Gang Member-3; (d) HARRIS then took out a knife and stabbed Square Gang Member-3 multiple times. These statements, from HARRIS to CW-3, are co-conspirator statements admissible at trial under Rule 801(d)(2)(E) as they informed and updated CW-3 on the status and progress of the conspiracy, *Desena*, 260 F.3d at 158, and they "serve[d] to foster trust and cohesiveness" between HARRIS and CW-3, *id.*[4]

Similarly, the Government expects a cooperating witness, who was an associate of 18 Park at the time ("CW-4"), to testify about statements COREY HEYWARD and JONATHAN

_____

[4] In addition to being admissible as a co-conspirator statement, the statement described in this paragraph, and other statements described in this section, are also admissible as statements against penal interest under Federal Rule of Evidence 804(b)(3). *See United States* v. *Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (explaining that to admit an out-of-court statement as a statement against interest, the proponent must establish by a preponderance of the evidence that "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement" (quotation marks omitted)).

RODRIGUEZ made to CW-4 regarding 18 Park's drug distribution activities, and HEYWARD's role within that network. For example, the Government expects CW-4 to testify that, when CW-4 joined 18 Park's drug distribution business, CW-4 was informed by HEYWARD and RODRIGUEZ, among others, that 18 Park had previously stopped distributing heroin, and at the time viewed heroin distribution as a potential area into which 18 Park's drug business might expand. HEYWARD told CW-4 that HEYWARD had previously sold heroin for 18 Park, but the heroin HEYWARD sold led to heroin overdoses, which brought unwanted police attention to the area. HEYWARD told CW-4 that, to avoid the unwanted police attention, HEYWARD and 18 Park stopped selling heroin. RODRIGUEZ also told CW-4 that, in the past, 18 Park had sold particularly potent heroin, but that the gang ceased selling the heroin following overdoses. Shortly after CW-4's conversations with HEYWARD and RODRIGUEZ, 18 Park resumed selling heroin and CW-4 personally participated in that heroin distribution. HEYWARD's statements to CW-4 are admissible as to HEYWARD as statements of a party opponent under Rule 801(d)(2)(A), and HEYWARD's and RODRIGUEZ's statements are admissible as to all defendants as co-conspirator statements under Rule 801(d)(2)(E).

Along the same lines, the Government expects CW-4 to testify that COREY HEYWARD told CW-4 that HEYWARD and RAHEEM AMARIZAN sold drugs together. Specifically, the Government expects CW-4 to testify, in substance and in part, that HEYWARD told CW-4 that he provided RAHEEM AMARIZAN money to purchase drugs, including crack cocaine, and RAHEEM AMARIZAN bought the drugs, sold them, and shared the profits with HEYWARD. These statements from HEYWARD to CW-4 are admissible against HEYWARD as statements of a party opponent, and they are admissible against the other defendants as co-conspirator statements made during and in furtherance of the conspiracy.

### 3. Statements made by 18 Park members or associates directing other members or associates to commit acts as part of the racketeering conspiracy

Statements made by members or associates of 18 Park directing other members or associates to take actions on behalf of the gang are also admissible as co-conspirator statements. These statements "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958, and "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158, and thus are admissible as co-conspirator statements under 801(d)(2)(E).

For example, the Government expects CW-1 to testify that, in early 2011, COREY HEYWARD provided CW-1 with Firearm-1 and Firearm-2, and directed CW-1 to hold those firearms for the gang inside a certain apartment within the Patterson Houses. HEYWARD's statements are admissible against HEYWARD as an opposing party's statement under Rule 801(d)(2)(A), but they are also admissible as to the other defendants as co-conspirator statements. CW-1's testimony will make clear, moreover, that HEYWARD's statements "prompt[ed] [CW-1] to respond in a way that promote[d] or facilitate[d] the carrying out of" the racketeering enterprise, as CW-1 is expected to testify that: (a) CW-1 did in fact hold the two firearms as HEYWARD directed; (b) that at least one of those firearms was used by 18 Park members to shoot at rival gang members; and (c) that one of the firearms was used by CW-1, CC-1, WILLIAM AMARIZAN, and RAHEEM AMARIZAN during the shootout on or about July 8, 2011 in which RAHEEM AMARIZAN was shot.

As another example of this category of co-conspirator statement, the Government expects CW-1 and CW-3 to testify about separate instances during which CW-1 and CW-3 had disputes with HEYWARD about drug customers. The Government expects CW-1 and CW-3 to testify

that, on each occasion, JONATHAN RODRIGUEZ, a/k/a "Bebo," mediated the dispute over drug customers. The Government expects CW-3 to testify that RODRIGUEZ and other 18 Park members ultimately created a rule for the gang, under which the member who sold to a particular drug customer first would have selling priority as to that customer. RODRIGUEZ's statements to CW-1 and CW-3, which RODRIGUEZ made in an effort to mediate their drug disputes with HEYWARD, were statements made in order to "prompt [CW-1 and CW-3] to respond in a way that promotes or facilitates the carrying out of" the gang's drug distribution activities, *Maldonado-Rivera*, 922 F.2d at 958, in that RODRIGUEZ's statements sought to resolve a dispute among members of the gang in order to ensure the gang's drug business continued to run smoothly. These statements are thus admissible as co-conspirator statements under Rule 801(d)(2)(E).[5]

4.    **Statements made by 18 Park members or associates about the status of other members or associates of 18 Park**

Statements made by one 18 Park member or associate to another 18 Park member or associate about the status of other members of the racketeering conspiracy are admissible for the same reasons. For example, the Government expects CW-4 to testify that, in or about 2014, JONATHAN HARRIS told CW-4 that MIGUEL ROMERO was rising within the gang, and offered the example that ROMERO had entered rival gang territory and shot at rival gang members. The Government also expects CW-4 to testify that JASON BENJAMIN told CW-4 that ROMERO was "putting in work" for the gang, which CW-4 understood to mean that ROMERO was committing acts of violence on behalf of the gang. In addition, the Government

---

[5] To the extent the Government introduces testimony only about the rule RODRIGUEZ and others created for the gang's drug dealers, the Government believes the rule itself would be admissible as non-hearsay. Nevertheless, in the event the Government does seek to offer testimony about the statements surrounding the conversations with RODRIGUEZ and others that precipitated, and to the extent the Government offers testimony about these statements for their truth, the Government respectfully submits they would be admissible as co-conspirator statements.

expects multiple cooperating witnesses, including CW-4, to testify that one way members can rise through the ranks of 18 Park is by committing violent or other acts on behalf of the gang. The Government intends to offer the statements made by JASON BENJAMIN and HARRIS to CW-4, not to show that ROMERO had committed any particular shooting or other violent act on behalf of the gang, but to show that JASON BENJAMIN and HARRIS viewed ROMERO was rising through the ranks of 18 Park. The statements from HARRIS and JASON BENJAMIN conveying the fact that ROMERO was rising within the gang are in furtherance of the conspiracy because they informed CW-4 on the status and progress of the conspiracy, *see Desena*, 260 F.3d at 158, and informed CW-4 of "the identity and activities of his coconspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989).

### 5. Statements made by 18 Park members or associates during the course of the conspiracy while incarcerated on the charges in this case

The charged racketeering conspiracy in this case extends to July 2016—beyond the arrests of the defendants in this case. Since their respective arrests, most of the defendants in this case have been incarcerated at the Metropolitan Correctional Center in New York, New York (the "MCC"). While housed together, the members of 18 Park have kept their conspiracy alive in a number of ways. Among other things, the members of the gang have conspired to sell illegal drugs and other contraband within the MCC; they have worked together in an attempt to identify witnesses cooperating with the Government; they have worked together to dissuade other gang members from cooperating with the Government; and they have discussed case strategies and what they believed to be the Government's case against them, and how they might prevent witnesses from testifying at trial. Certain of the statements made by the 18 Park members or associates in furtherance of the conspiracy made while incarcerated at the MCC are admissible as co-conspirator statements under Rule 801(d)(2)(E).

For example, before CW-1 became a cooperating witness for the Government, CW-1 was incarcerated at the MCC with other members of 18 Park, including MIGUEL ROMERO. The Government expects CW-1 to testify, in substance and in part, that, while incarcerated together, ROMERO told CW-1, among other things, that: (1) before being arrested in this case, ROMERO had paid 18 Park member MARQUIS WRIGHT for a firearm; (2) ROMERO had previously shot at Square Gang Member-2; and (3) ROMERO had written and performed rap lyrics describing the incident in which he fired gunshots at Square Gang Member-2. As to ROMERO, each of these statements is admissible as a statement of a party opponent, under Rule 801(d)(2)(A). As to the remaining defendants, each of ROMERO's statements is admissible as a co-conspirator statement, under Rule 801(d)(2)(E), because each statement "serve[d] to foster trust and cohesiveness" between ROMERO and CW-1, and "provide[d] reassurance" that ROMERO was not cooperating. *Desena*, 260 F.3d at 158 (internal quotations omitted). The Government expects CW-1 to testify that one way 18 Park members attempted to show others they were not cooperating was to discuss their prior criminal acts with the others. These statements from ROMERO to CW-1, which inculpated him in the criminal conduct charged here, fit this mold, and served to "reassur[e]" CW-1—who was a member of the conspiracy at the time—that ROMERO continued to be a trusted member of the gang, and was not cooperating with the Government. ROMERO's statements accordingly are admissible as co-conspirator statements.

### 6.	Statements made by 18 Park members or associates about the history and practices of 18 Park and its leadership structure

During the course of the racketeering conspiracy, members of 18 Park spoke with each other about the gang's history, its practices, its norms and rules, and its leadership structure, among many other general topics. Statements of this type by one 18 Park member to another during the course of the racketeering conspiracy are admissible as co-conspirator statements.

For example, the Government expects CW-4, in substance and in part, to testify about numerous statements JASON BENJAMIN made to CW-4 about the history of 18 Park, about which JASON BENJAMIN had personal knowledge, because JASON BENJAMIN was one of the original members of 18 Park. JASON BENJAMIN also made numerous statements to CW-4 about the norms and practices of 18 Park, as well as the gang's leadership structure. Among other things, JASON BENJAMIN: (a) explained to CW-4 the scope of 18 Park's territory; (b) identified the leaders of 18 Park; (c) taught CW-4 the gang's handshake; (d) explained the evolution of 18 Park and identified its rival gangs; and (e) explained how a member of 18 Park could rise through the ranks of the gang.

Similarly, the Government expects CW-3, in substance and in part, to testify about instructions JONATHAN RODRIGUEZ, a/k/a "Bebo," gave to 18 Park members about how they should conduct shootings. RODRIGUEZ instructed the gang members, for example, that when the gang members committed shootings, they should proceed in groups of at least three—one person to carry the firearm and commit the shooting, one person to serve as the lookout, and one person to hold the door for the shooter and the lookout to escape quickly into one of the nearby Patterson Houses buildings. CW-3 will further testify, the Government expects, that a number of shootings committed by 18 Park members, including shootings in which CW-3 personally participated, followed RODRIGUEZ's instructions.

Along the same lines, the Government expects CW-4 to testify that, in several instances, more senior leaders of 18 Park would determine which other members of 18 Park would commit shootings and other violent acts. CW-4 will testify, for example, that RODRIGUEZ instructed that the gang should send its junior members to conduct shootings against rival gang members. RODRIGUEZ told CW-4 that the senior members of the gang would send the junior members of the gang to commit the shootings both because those junior members could use those violent acts as a means to rise through the gang's leadership structure, and because, if those junior members were caught by law enforcement, those junior members would be less likely to face serious charges and more likely to be granted bail on account of their youth. In addition, CW-4 will testify that CW-4 was present for shootings committed by junior members or associates of 18 Park, at the direction of more senior members of the gang. These statements, just like the other co-conspirator statements described above, are admissible under Rule 801(d)(2)(E).[6]

### 7. Statements made by members and associates of 18 Park in rap videos uploaded to YouTube

The Government seeks to offer at trial excerpts of certain music videos in which MIGUEL ROMERO and other 18 Park members made statements relating to and in furtherance of

---

[6] None of the co-conspirator statements identified herein are precluded under Federal Rule of Evidence 403. The proffered testimony is highly probative of each defendant's participation and position within the charged racketeering conspiracy. Although the testimony implicates the defendants in the charged racketeering conspiracy, it is not unduly prejudicial, which is the focus of Rule 403. *See United States* v. *Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995). The co-conspirator statements identified above, moreover, are no more serious than the predicate acts the Government intends to prove at trial—for example, the shootings committed by HEYWARD, RAHEEM AMARIZAN, and ROMERO. *See, e.g.*, *United States* v. *Gilliam*, 994 F.2d 97, 100 (2d Cir. 1993) ("[E]vidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.") (citation omitted). The co-conspirator statements, therefore, are not only direct evidence of the defendants' participation in the charged conspiracies, but they are also not "any more sensational or disturbing than the" acts with which the defendant has been charged. *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States* v. *Smith*, 727 F.2d 214, 220 (2d Cir. 1984).

the racketeering enterprise, and to elicit testimony from cooperating witnesses about these music videos. ROMERO's statements are admissible against him as statements of a party opponent under Rule 801(d)(2)(A). ROMERO's statements are admissible against the other Group 1 trial defendants (and the other co-conspirator's statements are admissible against ROMERO) as co-conspirator statements under Rule 801(d)(2)(E).

### a.    Additional relevant law on admissibility of rap videos in this context

"Rap lyrics and tattoos are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." *United States* v. *Pierce*, 785 F.3d 832, 841 (2d Cir. 2015). In *Pierce*, which involved racketeering and other charges against members of a violent gang that like 18 Park operated primarily in the South Bronx and was a rival of the Young Gunnaz, the Second Circuit affirmed the district court's decision to admit rap videos to show the defendant's "association with [the racketeering enterprise]" and his "animosity toward the Young Gunnaz." *Id.* The rap video in question "depicted [the defendant], a cooperating witness . . . , and a number of other [gang] members." *Id.* In the video, the defendant "is seen rapping: 'YG to OG / Somebody make somebody nose bleed / I'm OG shoot the Ruger / I'm a shooter.'" *Id.* At trial, the cooperating witness "served as a guide through the lyrics, testifying that the Young Gunnaz crew, or YG, was feuding with the OG [gang]." *Id.*

In reviewing the district court's decision to admit the rap video, the Second Circuit explained that "the rap video [evidence was] relevant, [its] probative value was not outweighed by the danger of unfair prejudice, and [the defendant's] First Amendment rights were not implicated when the district court admitted the evidence." *Id.*; *see also United States* v. *Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of profane and violent rap recordings over

challenge, under Federal Rule of Evidence 403, where lyrics were probative of defendant's participation in narcotics conspiracy); *United States* v. *Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with his father Charles Taylor's Anti-Terrorism Unit, which tortured Sierra Leoneans in Liberia). As the Second Circuit explained in *Pierce*, "[t]he video helped establish [the defendant's] association with members of the enterprise and his motive to participate in the charged conduct against members of the Young Gunnaz." *Id.* The Second Circuit accordingly affirmed the district court's decision admitting the rap video. *Id.*; *see also United States* v. *Applins*, 637 F.3d 59, 80 (2d Cir. 2012) (in racketeering gang case, affirming conviction over sufficiency of the evidence challenge, relying in part on probative value of rap lyrics introduced at trial); *United States* v. *Rivera*, No. 13 Cr. 139 (KAM), 2015 WL 1757777, at *7-*8 (E.D.N.Y. April 17, 2015) (in racketeering case, admitting certain YouTube videos over objections and setting forth procedures governing admission of videos at trial).

### b. Rap videos performed by MIGUEL ROMERO

Two of the rap videos the Government seeks to introduce at trial include statements made by MIGUEL ROMERO. The first video, entitled "Xstreets Presents 'Show & Prove' feat. Mula Escobar" (the "Xstreets Video"), was uploaded to YouTube on or about December 31, 2014 by a person with the username "Cross Streets." The Xstreets Video, which is filmed in the Patterson Houses area, begins by showing buildings in the Patterson Houses, with the camera zooming in on the street signs showing the intersection of East 145th Street and College Avenue—the center of what 18 Park considers to be its territory.[7] The Xstreets Video then shows other parts of the

---

[7] A draft transcript of this video is attached as Exhibit A. As of this filing, this video remained

Patterson Houses, including a sign that reads "Patterson Playground," the basketball court where a number of the violent acts charged in this Indictment occurred, and a number of other buildings in 18 Park's territory within the Patterson Houses. The video goes on to show several 18 Park members and associates with ROMERO, including JONATHAN RODRIGUEZ and WILLIAM AMARIZAN, while ROMERO sings the rap lyrics.

The second video, entitled "Mula Escobar – meek mill into dreams and nightmares remix" (the "Mula Escobar Video"), was uploaded to YouTube on or about July 7, 2013 by a person with the username "MULA_ESCOBAR," which is an alias often used by ROMERO.[8] The Mula Escobar Video shows a single photograph of ROMERO under the heading "Mula Escobar," and includes a voice—which cooperating witnesses will identify as ROMERO's—singing rap lyrics.

The Xstreets Video runs 2 minutes and 59 seconds, and the Mula Escobar Video runs 2 minutes and 42 seconds. As to the Xstreets Video, the Government proposes to play slightly more than two minutes—from the 0:15 mark to the 2:30 mark—which contains substantially all of the statements made by ROMERO in the video. As to the Mula Escobar Video, the Government also proposes to play slightly more than two minutes–from the 0:10 mark to the 2:35 mark—which also contains substantially all of the statements made by ROMERO in the video. The Government intends to call cooperating witnesses who will explain the significance of the lyrics of each video and identify several of the participants in the Xstreets Video.

---

available on YouTube under the title, "Xstreets Presents 'Show & Prove' feat. Mula Escobar." The draft transcript of this and the other videos described in this memorandum are preliminary and have not yet been certified.

[8] A draft transcript of this video is attached as Exhibit B. As of this filing, this video remained available on YouTube under the title, "Mula Escobar – meek mill into dreams and nightmares remix."

As an initial matter, the statements made by ROMERO in these videos are admissible as to ROMERO as statements of a party opponent, as they contain admissions about his membership and participation in the charged racketeering enterprise, and about the specific acts—including a shooting—he committed on behalf of 18 Park. For example, in the Xstreets Video, ROMERO sings that he "ma[d]e that nigga Salsa, when I be on my blammin' shit."[9] The video then shows ROMERO making what appears to be a gun sign and shooting motion with his hands. The Government expects CW-1 to testify, in substance and in part, that ROMERO told CW-1 that these lyrics described the incident discussed above, in which, during the Summer of 2013, ROMERO shot at Square Gang Member-2 and other rival gang members in the vicinity of 300 East 143rd Street in the Patterson Houses. Specifically, CW-1 will testify that, while incarcerated together at the MCC, ROMERO told CW-1 that Square Gang Member-2 appeared to be "dancing" to avoid the shots fired by ROMERO, and that ROMERO's lyrics—that he "ma[d]e that nigga Salsa, when I be on my blammin' shit"—referred to the fact that ROMERO made Square Gang Member-1 dance ("Salsa") when ROMERO fired shots at the rival gang member ("blammin' shit").

ROMERO's other statements in the videos also constitute admissions of a party opponent. As another example, both videos begin with ROMERO making statements about an incident in which his "man[] got shot." The Government expects CW-1 and another cooperating witness, who was a member of 18 Park ("CW-5"), to testify that the beginning of each video discussing the death of ROMERO's "man" is a reference to the murder of 18 Park member Mavon Chapman, a/k/a "E Saw," a/k/a "Max-E." The Government expects CW-5, for example, to testify that: (a) ROMERO was with Chapman, CW-5, and other 18 Park members inside an

---

[9] This portion of the video appears at approximately the 1:55 mark.

apartment within the Patterson Houses on the day Chapman was murdered; (b) before Chapman's murder, the group of 18 Park members left the Patterson Houses area, which is when Chapman was shot and killed; (c) ROMERO had stated an intention to leave the Patterson Houses that day with the group, but ultimately elected to stay behind; (d) ROMERO later learned that Chapman had been killed; and (e) CW-5 understood the introduction to both videos to refer to the murder of Chapman.

More generally, the Government expects cooperating witnesses to testify that the Chapman murder served as an impetus for 18 Park's decision to break from the YGz, and that 18 Park's violent acts escalated after Chapman's murder, in part, in an effort to retaliate for the murder. In each video, ROMERO states his desire to retaliate for Chapman's murder, referencing specific past violent acts he and other members of the gang had or would commit as part of that retaliatory effort.

At a minimum, these statements demonstrate that ROMERO is aware of Chapman's murder and the fact that it served as a source of animosity between 18 Park and its rival gangs. And the videos show ROMERO's association with the enterprise. *See Pierce*, 785 F.3d at 841 (affirming district court's admission of rap video and explaining "[t]he video helped establish [the defendant's] association with members of the enterprise and his motive to participate in the charged conduct against members of the Young Gunnaz").

In addition to being admissible against ROMERO as statements of a party opponent, ROMERO's statements in the videos are also admissible against the other Group 1 trial defendants as co-conspirator statements. The Government expects that, at trial, cooperating witnesses will testify, in substance and in part, that recorded musical performances constituted one way in which 18 Park glorified membership in the gang, and in which the members of the

gang cast 18 Park in a favorable light. Although they do not appear in either the Xstreets Video or the Mula Escobar Video, three cooperating witnesses—CW-1, CW-3, and CW-5—appeared in other videos in which ROMERO has rapped, and which were also uploaded to YouTube. The Government expects those cooperating witnesses to testify that: (a) ROMERO's music constituted one way the members of 18 Park enhanced the status of the gang, and spread the gang's message about the violent acts the gang had (or would) commit, the type of drug-dealing activity the gang conducted, and the parts of the Bronx the gang considered its territory; (b) it was desirable for members and associates of 18 Park to be included in ROMERO's music videos, and ROMERO's perceived talent as a rapper enhanced his own status within the gang; (c) these videos helped recruit new members, who were made aware of the gang's music videos, and may have desired to appear in them as part of the gang. This testimony supports the conclusion that the statements in the video were in furtherance of the racketeering conspiracy: the statements promoted cohesion within the gang, helped recruit new members, and motivated its current members to continue being active in their membership.

More specifically, and as explained above, the Government expects cooperating witnesses to testify that the lyrics in both the Xstreets Video and the Mula Escobar Video describe specific instances of central importance to 18 Park and that are at the center of the charged racketeering conspiracy in this case—for example, the Chapman murder and 18 Park's efforts to retaliate against YGz and other rival gangs for that and other acts of violence committed against 18 Park. Indeed, as if to confirm that in the videos ROMERO is speaking on behalf of the gang, ROMERO concludes the Xstreets Video by stating, "let's do this shit man, gang to gang."

### c. Rap videos performed by other 18 Park Members

The Government also seeks to introduce excerpts of one additional YouTube video in which 18 Park members—but not any of the anticipated Group 1 trial defendants—rap about the activities of the gang. The additional video is entitled "Maybach and Nauti Mackin and Ballin Playin Wit the Beat" (the "Maybach and Nauti Video"), and was uploaded on July 18, 2011 by a person with the username TakeMoney62. In the video, 18 Park members DIQUINN LACEND, a/k/a "Nauti," WILLIAM KNOX, a/k/a "Maybach," and DAQUAN MCBETH, a/k/a "Day Day," a/k/a "Strong," are shown singing lyrics about 18 Park's activities.[10] The video runs three minutes and three seconds, and the Government seeks to introduce the substantial majority of the video at trial. The Government also intends to call CW-1 to explain the significance of certain lyrics.

The Government expects CW-1, who has personal familiarity with the video, to testify that TakeMoney62 is the YouTube username used by KNOX. CW-1 will further testify that KNOX uploaded several other videos to YouTube under the same username, which depicted various 18 Park members doing a number of different things—from rapping, to drinking and smoking, to socializing. CW-1 will testify that the videos KNOX uploaded served to bond 18 Park members together, as the 18 Park members viewed the posting of the videos as a public display of their affiliation with the gang.[11] In addition, the Government expects CW-1 to testify

---

[10] A draft transcript of this video is attached as Exhibit C. As of this filing, this video remained available on YouTube under the title, "Maybach and Nauti Mackin and Ballin Playing Wit the Beat."

[11] KNOX has uploaded at least twelve such videos to YouTube, each of which depicts a collection of 18 Park members. One of these videos, for example, commemorated a "YM Night Out," which was an event the gang periodically held for its members to bond over a night of socializing at various commercial establishments, typically outside the Bronx; non-gang members were not permitted to attend. Although the Government has preserved these videos

that performing rap videos is one way a member can gain notoriety and status within the gang, and can help a gang member rise through the ranks of the gang.

The Government further expects CW-1 to testify that the Maybach and Nauti Video, just like the ROMERO videos discussed above, reference the death of Mavon Chapman, a/k/a "Max-E," when KNOX states "SIP Max-E," which CW-1 will explain means "sleep in peace." Moreover, CW-1 will explain that the rap lyrics describe the racketeering enterprise ("Young Money is the crew") and describe the fact that the enterprise will commit violent acts against its rivals ("18 Park will wash your ass up like a shower"). CW-1 will further testify that the opening words shown on the video, "Mula Ave," serve as a reference to 18 Park.

The lyrics in the video also describe 18 Park's drug distribution activities and leadership structure. KNOX states that members of 18 Park are as much a part of the scenery in 18 Park's territory as "trees and rocks," and the members sell with marijuana ("trees") and crack cocaine ("rocks") in that territory. *See* Ex. C (KNOX: "Yeah we on the block like trees and rocks / Yeah we on the block got trees and rocks."). The rap lyrics identify MARQUIS WRIGHT ("Money Mark") as the supplier of the gang's drugs. *See id.* (KNOX: "Thanks to Money Mark for that motherfucking sour."); *see also id.* (KNOX: "Call up Money Mark for that motherfucking sour"). The video specifically references other members of 18 Park, including JONATHAN RODRIGUEZ, a/k/a "Bebo" (KNOX: "Might call Bebs and roll up the sour."). And KNOX states his desire that RODRIGUEZ ("Bebs"), JASON BENJAMIN ("JC Baller") and other 18 Park member LEON VEGA ("Little Lee"), all of whom were incarcerated at the time, be freed. *See id.* (KNOX: "Free Bebs, JC Baller, Little Lee.").

---

and produced them to all defendants, at present, the Government does not intend to introduce excerpts of any at trial other than the Maybach and Nauti Video described herein.

Just like the video at issue in *Pierce*—and just like the ROMERO videos described above—the statements in the Maybach and Nauti Video constitute co-conspirator statements in furtherance of the conspiracy, as the statements in the video "foster trust and cohesiveness" among the gang's members, and serve to update other gang members on the progress of the conspiracy. *Desena*, 260 F.3d at 159. The statements in the Maybach and Nauti Video accordingly should be admitted as co-conspirator statements.[12]

\*      \*      \*

At bottom, the statements included in the rap videos the Government seeks to introduce are not stray statements that merely mention 18 Park and its activities, but the statements are part of rap videos that appear to be singularly focused on 18 Park's racketeering activities—which, the Government expects, is how cooperating witnesses will testify they understood them. The statements, moreover, describe particular acts—for example, the Chapman murder—committed against members of 18 Park that will be central to the jury's understanding of how 18 Park evolved and why its members committed the racketeering acts as charged. The statements reference specific acts taken by members of 18 Park in response, such as ROMERO's statements about the incident in which he shot at rival gang members. The statements describe the structure of 18 Park's narcotics distribution activity, identifying "Money Mark," or MARQUIS WRIGHT

---

[12] In addition to the foregoing, the Government anticipates showing a clip—approximately ten seconds long—of a final rap video in which JAHNOMI BENJAMIN and other individuals perform in a YouTube video entitled (and still publicly available, as of this filing) "Young Money Bosses, Macombs Blocc, Jamroc Spittin {Fucc 280}." The Government anticipates showing the approximately ten-second clip—from the 3:41 mark to the 3:52 mark—and eliciting from a cooperating witness that the individuals shown during the clip are performing the 18 Park handshake, while JAHNOMI BENJAMIN states "Young Money up," and "YM up." Because the Government is not offering any statements in this video clip for their truth, the Government seeks to introduce this video clip without relying on the clip as involving a co-conspirator statement.

as the supplier.  And, at least with the Xstreets Video, the statements come in the context of a video depicting the members and associates of 18 Park in the center of 18 Park's territory in the Patterson Houses, with a particular focus on parts of the territory 18 Park members believe to be significant, such as the intersection of East 145th Street and College Avenue and the Patterson Playground.

These statements are thus not only co-conspirator statements, but they are highly probative as well.  And because the statements contained in each of the videos center around charged racketeering acts, the co-conspirator statements at issue are not unduly prejudicial under Rule 403.  For all of these reasons, this Court should admit the statements contained in the rap videos, just as the district court did in *Pierce*, which the Second Circuit affirmed.  *See Pierce*, 785 F.3d at 841.

## II.  The Court Should Admit Testimony About a Bystander's Reaction to a Shooting as an Excited Utterance or Present Sense Impression

At trial, the Government expects a cooperating witness ("CW-6"), to testify that, in or about the Summer of 2013, CW-6 personally observed MIGUEL ROMERO shoot at Square Gang Member-2 and other Square Gang members in the vicinity of 300 East 143rd Street in the area of one of the basketball courts in the Patterson Houses.  After CW-6 observed ROMERO conduct the shooting, CW-6 heard several individuals in the area scream.  A few seconds after the shooting, ROMERO heard an unidentified female ("UF-1") say, in substance and in part, "that was that Spanish guy Mikey from 18."  CW-6 will testify that CW-6 believed UF-1 sounded scared, and was positioned generally in the line of ROMERO's fire, such that it was possible she could have been shot (but to CW-6's knowledge, was not).  At trial, the Government expects to call CW-6 to testify about CW-6's observations of ROMERO as the shooter, and also that CW-6 later heard ROMERO tell other 18 Park members that ROMERO had committed the

shooting.  The Government also intends to elicit from CW-6 testimony about UF-1's statements seconds after the shooting—namely, UF-1's statements that "the Spanish guy Mikey from 18" had committed the shooting.  CW-6 should be permitted to testify about UF-1's statements either as an excited utterance admissible under Rule 803(2) or as a present sense impression admissible under Rule 803(1).

### A.    Applicable Law

#### 1.    Excited utterances admissible under Rule 803(2)

Rule 803(2) provides that a declarant's out-of-court statements "relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition" are admissible.  Fed. R. Evid. 803(2); *see also United States* v. *Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).  The rationale underlying the exception is that "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability."  *Tocco*, 135 F.3d at 127. When a statement is offered as an excited utterance under Rule 803(2), its proponent must demonstrate three things.  First, the proponent must establish that a startling event occurred.  Second, the proponent must establish that the statement was made while the declarant was under the stress of excitement caused by the startling event.  Third, the proponent must establish that the declarant's statement relates to the startling event.  *United States* v. *Brown*, 254 F.3d 454, 458 (2d Cir. 2001).

An excited utterance "need not be contemporaneous with the startling event to be admissible."  *Tocco*, 135 F.3d at 127.  Rather, it must be contemporaneous with the excitement generated by the event.  *United States* v. *Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (citing *United States* v. *Joy*, 192 F.3d 761, 766 (7th Cir. 1999)).  And, "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of Rule 803(2), under the stress of excitement caused by the

event or condition." *United States* v. *Jones*, 299 F.3d 103, 112 (2d Cir. 2002) (internal quotation marks and citations omitted).

Startling events involving violence are more likely to generate stress and longer periods of excitement during which statements made can qualify as excited utterances. *See Delvi*, 275 F. Supp. 2d at 415; *see also Webb* v. *Lane*, 922 F.2d 390, 394 (7th Cir. 1991) (finding that statements made between one and two hours after being shot six times—an "extremely violent experience"—were not the result of reflective thought). A violent event such as a shooting is "likely to produce the utmost in excitement and shock . . . ensur[ing] the utterance's spontaneity." *Delvi*, 275 F. Supp. 2d at 415 (quoting *Puleio* v. *Vose*, 830 F.2d 1197, 1207 (1st Cir. 1987)). This rule applies regardless of whether the declarant of the excited utterance is unavailable. *See* Fed. R. Evid. 803(2).

## 2.    Present sense impressions admissible under Rule 803(1)

The Federal Rules of Evidence also specifically make admissible, and exclude from the hearsay rule, present sense impressions—*i.e.*, statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1). Such statements "are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States* v. *Jones*, 299 F.3d 103, 112 (2d Cir. 2002). By the plain terms of the Rule, a statement may qualify as a present sense impression even if the declarant is not describing an event as it unfolds. In fact, the Advisory Committee Note to Rule 803(1) specifically states that "in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable." *See, e.g.*, *Jones*, 299 F.3d at 113 (affirming admission of statements to an off-duty police officer that were "nearly contemporaneous with the event described"). Just as with the excited utterance exception, the declarant's availability is immateri-

al to whether the present sense exception applies.  Fed. R. Evid. 803.

### B.    Discussion

UF-1's statement is admissible, through the testimony of CW-6, both as an excited utterance and, alternatively, as a present sense impression.

To begin with, the Government can satisfy each of the three requirements necessary for a statement to be admitted as an excited utterance.  *First*, ample evidence demonstrates the startling event—*i.e.*, the shots ROMERO fired at the rival gang members.  Among other things: (a) CW-6 personally observed the shooting; (b) CW-6 heard ROMERO tell other 18 Park members ROMERO had committed the shooting; (c) ROMERO told CW-1 that ROMERO had committed the shooting; (d) ROMERO wrote and performed rap lyrics describing the rival gang member's reaction to the shooting ("I make that nigga Salsa, when I be on my blammin' shit"); and (e) ROMERO told CW-1 that those lyrics related to the shooting.  There can be no question here, moreover, that UF-1 had personal knowledge of the startling event, as she made her statement mere seconds after witnessing it, just as CW-6 had.  *See Tocco*, 135 F.3d at 128.

*Second*, the statement was made while the declarant was under the stress of excitement caused by the startling event.  The shooting in question unquestionably counts as a startling event.  *See Delvi*, 275 F. Supp. 2d at 415; 830 F.2d at 1207; *see also United States* v. *Brown*, 254 F.3d 454, 458 (3d Cir. 2001) (holding that declarant's statement that he saw a man with a gun constituted a Rule 803(2) "startling event"); *Cole* v. *Tansy*, 926 F.2d 955, 958 (10th Cir. 1991) (same).    That is all the more so here, where the Government expects CW-6 to testify that, even though to CW-6's knowledge UF-1 was not shot, UF-1 was in the line of ROMERO's fire.  And UF-1 was still under the stress of excitement caused by the shooting when she made the statement in question.  Indeed, the Government expects CW-6 to testify that, after ROMERO

conducted the shooting, several individuals in the area screamed. Just a few seconds later, UF-1 made the statement in question, and CW-6 believed UF-1 sounded scared when she made the statement. *See, e.g.*, *United States* v. *Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990); *United States* v. *Mejia-Velez*, 855 F. Supp. 607, 614 (S.D.N.Y. 1994).

*Third*, and in a similar vein, there can be no serious dispute that the declarant's out-of-court statement (*i.e.*, her statement identifying ROMERO as the shooter) related to the startling event (*i.e.*, the shooting).

UF-1's statement should also be admitted, through the testimony of CW-6, as a present sense impression. As explained, the Rule 803(1) does not require that the statement be made at the exact moment the event being described takes place. Rather, as the Rule makes clear, statements may be admitted under Rule 803(1) where they "describe[e] or explain[] an event or condition made while the declarant was perceiving the event or condition, *or immediately thereafter*." Fed. R. Evid. 803(1). That is exactly what happened here, and UF-1's statement should be admitted on this ground as well.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the

Government's Motion *in Limine* in its entirety.

Dated:  New York, New York
September 19, 2016

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:  _____/s/_____
James McDonald
Max Nicholas
Assistant United States Attorneys
(212) 637-2405 /  -1565

**CERTIFICATE OF SERVICE**

The undersigned attorney, being duly admitted to practice before this Court, certifies that on September 19, 2016, the foregoing was served via this Court's CM/ECF service on all parties requiring service.

By: _____/s_____
James McDonald
Assistant United States Attorney