

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 9, 2016

**BY ECF**

Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States* v. *Jordan Rivera*, 15 Cr. 445 (PAE)

Dear Judge Engelmayer:

      The defendant in this case, Jordan Rivera, is scheduled to be sentenced on December 15, 2016, having pled guilty, pursuant to a plea agreement, to participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and possessing a firearm in furtherance of the racketeering conspiracy, which firearm was brandished, in violation of Title 18, United States Code, Section 924(C)(1)(A)(ii).[1]  The Government respectfully submits this letter in advance of the sentencing and in response to the defendant's pre-sentence submission ("Def. Mem.").

      In the plea agreement, the parties stipulated that the sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") is 154 to 171 months' imprisonment (the "Stipulated Guidelines Range), with a mandatory minimum term of imprisonment of eighty-four months, based, in part, on a calculation that the defendant had two criminal history points, placing him in Criminal History Category II.  The U.S. Probation Office calculates the defendant to have zero criminal history points, placing him in Criminal History Category I, which yields a Guidelines calculation of 147 to 162 months' imprisonment (the

---

[1] The S4 Indictment, to which the defendant pleaded guilty, alleges that the firearm charged in Count Thirteen was discharged, triggering the enhanced penalties of Section 924(c)(1)(A)(iii). Pursuant to the plea agreement between the parties, however, the Government and the defendant agreed that the defendant would plead guilty to the enhanced penalties of Section 924(c)(1)(A)(ii), and the defendant allocuted that the firearm charged in Count Thirteen was brandished (not discharged).  Thus, the parties agree that the applicable penalties are those set forth in Section 924(c)(1)(A)(ii).  Moreover, the defendant, through counsel, has agreed to waive his right to be charged with the "brandish" enhancement contained in Section 924(c)(1)(A)(ii) in an indictment or information.

"Applicable Guidelines Range").  As explained below, the Government agrees with the Probation Office's criminal history computation, and accordingly respectfully requests that the Court sentence the defendant to a sentence within the Applicable Guidelines Range of 147 to 162 months' imprisonment.  Such a sentence would be sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a).

## BACKGROUND

### A. Offense Conduct

As described in the pre-sentence investigation report ("PSR") dated November 16, 2016, the S4 Indictment in this case charged twenty-six members and associates of the violent street gang known as "18 Park" with participation in racketeering, narcotics, and firearms offenses between in or about 2006 and July 2016.  The PSR articulates in detail the operations of the 18 Park gang.  As the PSR explains, 18 Park was a highly territorial street gang that operated primarily in the vicinity of the Patterson Houses in the South Bronx.  PSR 15.  18 Park members, including Rivera, used this territory as a place to sell drugs, turning the area in and around the Patterson Houses into an open-air drug market.  *Id.*  Jordan Rivera played a central role in 18 Park's drug distribution business, and personally delivered drugs to customers in and around the Patterson Houses on numerous occasions.

18 Park members, including Rivera, protected the gang's territory by possessing and carrying firearms.  Some of these 18 Park members—including Rivera—committed acts of violence in connection with the gang's efforts to control its territory.  Those acts of violence included assaults, shootings, and murders.

Jordan Rivera was a core member of 18 Park who was integrally involved in the gang's drug distribution activity and its violent acts.  *See* PSR at 17-18.  During the investigation's undercover purchases of narcotics, an undercover law enforcement officer bought crack cocaine from Jordan Rivera on 14 different occasions, and bought marijuana from Rivera on three separate occasions.  Rivera made each of these drug deals in the Patterson Houses neighborhood.  Many of these drug deals originated near the deli on "Spanish Block"—the block on East 146th Street between College and Third Avenues.  And on many occasions the drugs were actually delivered inside Patterson Houses buildings.  *See* PSR 17.  The undercover buys from Rivera are summarized in the chart below.

Honorable Paul A. Engelmayer
December 9, 2016
Page 3 of 8

*Chart of Controlled Buys Involving Jordan Rivera*

| # | Individuals Involved | JD Name | Date | Location | Complaint/ Buy Report | Property Voucher | Lab Report | Drug | Bates Nos. | Voucher # | Recording |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Jordan Rivera | Jordan | 12/18/14 | 342 E. 146th Street | Y | Y | Y | crack | 153,541 – 153,545 | 2000388542 | Y |
| 2 | Tjon Macoll | TJ | 12/18/14 | 331 E. 146th Street | Y | Y | Y | weed | 153,546 – 153,552 | 2000388551 | N |
| 2 | Jordan Rivera | Jordan | 12/18/14 | 331 E. 146th Street | Y | Y | N | weed | 153,546 – 153,552 | 2000388551 | N |
| 3 | Jordan Rivera | Jordan | 1/5/15 | 342 E. 146th Street | Y | Y | Y | crack | 153,553 – 153,557 | 2000391231 | Y |
| 4 | Jordan Rivera | Jordan | 1/13/15 | 337 E.146th Street | Y | Y | Y | crack | 153,558 – 153,563 | 2000393399 | Y |
| 4 | Wilfredo Rivera | Ponytail | 1/13/15 | 337 E.146th Street | Y | Y | Y | crack | 153,558 – 153,563 | 2000393399 | Y |
| 5 | Jason Benjamin | JC | 1/20/15 | 308 E. 145th Street | Y | Y | Y | crack | 153,591 – 153,593 | 2000395613 | Y |
| 5 | Jordan Rivera | Jordan | 1/20/15 | 308 E. 145th Street | Y | Y | Y | crack | 153,591 – 153,593 | 2000395613 | Y |
| 5 | Unidentified | Braids | 1/20/15 | 308 E. 145th Street | Y | Y | Y | crack | 153,591 – 153,593 | 2000395613 | Y |
| 6 | Jordan Rivera | Jordan | 3/9/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,704 – 153,707 | 2000409324 | Y |
| 7 | Jordan Rivera | Jordan | 3/10/2015 | 328 E. 145th Street | Y | Y | N | crack | 153,713 –153, 716 | 2000409595 | Y |
| 8 | Jordan Rivera | Jordan | 3/18/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,746 – 153,749 | 2000412152 | Y |
| 9 | Jordan Rivera | Jordan | 3/24/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,750 – 153,755 | 2000413952 | Y |
| 10 | Jordan Rivera | Jordan | 4/1/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,761 – 153,766 | 2000416306 | Y |
| 11 | Jordan Rivera | Jordan | 4/8/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,787 – 153,790 | 2000418273 | Y |
| 12 | Jordan Rivera | Jordan | 4/9/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,802 – 153,806 | 2000418607 | Y |
| 13 | Jordan Rivera | Jordan | 5/4/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,851 – 153,854 | 2000425876 | Y |
| 13 | Christian Figueroa | Wavy | 5/4/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,851 – 153,854 | 2000425876 | Y |
| 14 | Jordan Rivera | Jordan | 5/12/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,855 – 153,859 | 2000428107 | Y |
| 14 | Daquan McBeth | Daquan | 5/12/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,855 – 153,859 | 2000428107 | Y |
| 14 | Raheem Amarizan | Raheem | 5/12/2015 | 328 E. 145th Street | Y | Y | Y | crack | 153,855 – 153,859 | 2000428107 | Y |
| 14 | Jordan Rivera | Jordan | 5/21/2015 | 331 E. 146th Street | Y | Y | Y | crack | 153,860 – 153,863 | 2000430945 | N |
| 14 | Tjon Macoll | TJ | 5/21/2015 | 331 E. 146th Street | Y | Y | Y | crack | 153,860 – 153,863 | 2000430945 | N |
| 15 | Tjon Macoll | TJ | 6/4/2015 | 331 E. 146th Street | Y | Y | N | weed | 153,866 – 153,869 | 2000435189 | Y |
| 15 | Raheem Amarizan | Raheem | 6/4/2015 | 331 E. 146th Street | Y | Y | N | weed | 153,866 – 153,869 | 2000435189 | Y |
| 15 | Jordan Rivera | Jordan | 6/4/2015 | 331 E. 146th Street | Y | Y | N | weed | 153,866 – 153,869 | 2000435189 | Y |
| 15 | James House | Gap | 6/4/2015 | 331 E. 146th Street | Y | Y | N | weed | 153,866 – 153,869 | 2000435189 | Y |

| 16 | Jordan Rivera | Jordan | 7/7/2015 | 328 E. 146th Street | Y | Y | N | crack | 153,879 – 153,883 | 2000445579 | Y |
| 17 | Jordan Rivera | Jordan | 7/13/2015 | 342 E. 145th Street | Y | Y | N | weed | 153,884 – 153,889 | 2000447675 | Y |
| 17 | Christian Figueroa | Wavy | 7/13/2015 | 342 E. 145th Street | Y | Y | N | weed | 153,884 – 153,889 | 2000447675 | Y |
| 17 | Unidentified | Tan | 7/13/2015 | 342 E. 145th Street | Y | Y | N | weed | 153,884 – 153,889 | 2000447675 | Y |
| 17 | Unidentified | Mel | 7/13/2015 | 342 E. 145th Street | Y | Y | N | weed | 153,884 – 153,889 | 2000447675 | Y |

Jordan Rivera also was personally involved in the violent acts of the gang. On October 2, 2014, Rivera served as the lookout for fellow 18 Park gang member Wali Burgos when Wali Burgos shot at and attempted to kill rival gang member Damar Morales. Rivera served as a lookout for Burgos and other 18 Park members before the shooting, and he took the gun from Burgos to hide it after the shooting. The shooting occurred in the Patterson Houses courtyard just behind 328 East 145th Street. Video surveillance shows Rivera present inside the 328 building before fellow 18 Park members Burgos, Corey Cooks, and Christian Figueroa arrive. Video surveillance then shows Corey Cooks hold the back door of the 328 building while Wali Burgos steps outside and fires a number of shots at Damar Morales. Video surveillance shows Morales duck to avoid the shots, and then run inside a Patterson House building across from the 328 building where Wali Burgos had been shooting. The video surveillance then shows Burgos retreat into the 328 building through a door Corey Cooks was holding open for Burgos. After the shooting, Burgos gave the gun to Jordan Rivera, who hid the gun. *See* PSR 17.

In addition, on July 29, 2014, Rivera was arrested near the Patterson Houses—in the vicinity of East 144th Street and Third Avenue with a loaded .32 caliber firearm—while walking with Christian Figueroa and other individuals. The firearm with which Rivera was arrested matched the shell casings recovered from the scene of the shooting of a rival gang member, Cedrick McEaddy, on June 7, 2014, with which Jonathan Harris, a/k/a "Eggy," has been charged in Count Six of the Indictment.[2] *See* PSR at 17.

Finally, pursuant to a search warrant, law enforcement officers searched a cellular telephone seized from Rivera, and discovered a video in which Rivera makes a number of statements implicating himself in the illegal activities of 18 Park. At one point in the video, Rivera states "It was for the family. I had to shoot that nigga. That nigga jumped my brother. I ain't gonna lie. I gonna kill one of those niggas. I just want you to hold me down when I'm in jail. . . . The feds, fuck the feds, I don't give a fuck about the feds. Suck my dick motherfucker. The feds can suck my dick." PSR 17-18. The Government has been unable to identify which particular shooting, if any, Rivera was referring when he stated "I had to shoot that nigga."

---

[2] The Government does not have information indicating that Rivera was involved in the June 7, 2014 shooting, but submits that the shooting is relevant as part of the basis to show that the firearm with which Rivera was arrested was one of the gang's guns.

Thus, the Government does not submit this statement to indicate that Rivera committed an additional substantive shooting, but simply to further demonstrate his participation in the enterprise and his awareness of a potential federal investigation, as well as to show Rivera recognized his conduct was wrong and illegal, yet continued to engage in it.

### B. The Presentence Investigation Report

On November 16, 2016, the Probation Office issued the PSR in this case. The PSR calculated a total offense level of 26, and a Criminal History Category of I, yielding a Guidelines range of 63 to 78 months' imprisonment on Count One, to be followed by an 84-month term of imprisonment on Count Thirteen, which must run consecutively to the sentence on Count One. *See* PSR at 21-25, 36. As the Probation Office calculates it, the defendant's Guidelines range is 147-162 months' imprisonment. This calculation is inconsistent with the plea agreement between the parties, which had calculated the Guidelines range as 154-171 months' imprisonment, based on a determination that the defendant had two criminal history points, placing him in Criminal History Category II.

The Government agrees with the Probation Office that the defendant should not be assessed two criminal history points for committing the instant offense while under a criminal justice sentence (the Conditional Discharge imposed on October 27, 2014). *See* PSR 28. That is because, pursuant to U.S.S.G. § 4A1.2(c)(1), criminal history points cannot be assigned under U.S.S.G. 4A1.1(d) where the underlying sentence did not warrant the assignment of criminal history points. *See* PSR 28. And because the defendant's October 27, 2014 conviction (which led to the Conditional Discharge) was for Disorderly Conduct, the defendant receives no criminal history points for that underlying conviction. *See* U.S.S.G. § 4A1.2(c)(1). Accordingly, the Government agrees with the Probation Office that the applicable Guidelines Range is 147 to 162 months' imprisonment, with a mandatory minimum of 84 months' (the "Applicable Guidelines Range"). *See* PSR 28. As explained below, the Government believes a sentence within the Applicable Guidelines Range would be reasonable in this case, and the Government respectfully requests such a sentence.

## ARGUMENT

### A. Applicable Law

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

Honorable Paul A. Engelmayer
December 9, 2016
Page 6 of 8

range"—that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that the district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B. Discussion

In this case, a sentence within the Applicable Guidelines Range of 147 to 162 months' imprisonment is sufficient, but not greater than necessary, to accomplish the purposes of sentencing, as set forth above. Consideration of several of the Section 3553(a) factors, in addition to the advisory Guidelines, supports such a sentence.

To begin with, a sentence within the Applicable Guidelines Range is appropriate in light of the nature and circumstances of the offense. *See* 18 U.S.C. § 3553(a)(1). As detained above, the crimes committed by 18 Park members (like Rivera), are extremely serious, and wreaked havoc on a community and its residents for an extended period of time. As demonstrated by the sheer number and frequency of the undercover buys from Rivera, Rivera was integrally involved in 18 Park's drug business. This drug business provided a primary source of funding for 18 Park, and it plagued the Patterson Houses community.

Even more seriously, however, Rivera personally participated in 18 Park's violent acts— including participating in the attempted murder of rival gang member Damar Morales in one of the Patterson Houses courtyards. Although Rivera was not the shooter, he served as a lookout for the shooting, and he hid the gun after the shooting. Thus, Rivera participated in the shooting with full knowledge of what was about to take place, and, with that knowledge, he acted to aid his fellow 18 Park members in the shooting, and to cover up the shooting afterward. This shooting, moreover, came just months after Rivera had been arrested—on July 29, 2014—in possession of another of 18 Park's guns, with other 18 Park members, in the Patterson Houses area. That July 29, 2014 gun arrest did not deter Rivera from future criminal conduct—indeed the attempted murder of Damar Morales occurred just months after that arrest. And Rivera engaged in the seventeen sales of drugs to the undercover officer (described above) after both the July 29, 2014 gun arrest and the October 2, 2014 attempted murder. Undeterred after his gun arrest, Rivera's criminal conduct appears to have escalated in both frequency and severity.

In short, Rivera served as a mid-level member of 18 Park, who was personally and centrally involved in both of 18 Park's primary criminal activities—drug dealing in its territory, and violent acts to protect that territory. Rivera engaged in those criminal activities on a consistent basis for more than one year prior to his arrest in this case. The Government respectfully submits that a sentence within the Applicable Guidelines Range of 147 to 162 months' imprisonment would thus be reasonable, and in particular, would serve to distinguish Rivera from those 18 Park defendants who are less culpable (thus warranting a lower sentence than Rivera) and those who are more culpable (thus warranting a higher sentence than Rivera).

Honorable Paul A. Engelmayer
December 9, 2016
Page 8 of 8

## **CONCLUSION**

For these reasons, the Government respectfully submits that a sentence within the Applicable Guidelines Range is warranted.

                                           Respectfully submitted,

                                           PREET BHARARA
                                           United States Attorney

                           By:       /s/
                                           James McDonald
                                           Max Nicholas
                                           Dina McLeod
                                           Assistant United States Attorneys
                                           (212) 637-2405 / -1565 / -1040

cc:  John Diaz, Esq.